

Law Office of Peter D. Hoffman, P.C.
Peter D. Hoffman, Esq. (PH-8306)
Attorney for Plaintiffs
200 Katonah Avenue
Katonah, NY   10536
Phone:         (914) 232-2242
Facsimile:     (914) 232-2245

**09 CIV. 905**

---

TC and KC, Individually, and as Parents of
DC[1],

              Plaintiffs,

*JUDGE SEIBEL*

**COMPLAINT**

        - against -

VALLEY CENTRAL SCHOOL DISTRICT;
VALLEY CENTRAL SCHOOL DISTRICT
BOARD OF EDUCATION; RICHARD M.
HOOLEY, Individually and as Superintendent
of the Valley Central School District; JOANNE
AVELLA, Individually and as Former Principal of
Valley Central High School; DR. DEBRA M.
LYNKER, Individually and as Former Interim
Principal of Valley Central High School; THOMAS
BALDUCCI, Individually, and as Vice Principal of
Valley Central High School; JOSEPH DI MAIO,
Individually and Vice-Principal of Valley Central
High School; BRIAN GIUDICE, Individually and
Former Vice-Principal of Valley Central High
School; GLENN TAYLOR, Individually and as
Guidance Counselor of Valley Central High
School; MAJOR ROBERT "BOB" BOULDIN,
Individually and as Senior Army Instructor of
Valley Central JROTC; SERGEANT PATRICK T.
WIMMER, Individually and as Army Instructor of
Valley Central ROTC; OFFICER KENNETH

---

[1] All student parties and actors herein are listed by pseudonym. This is done to protect
their privacy pursuant to and in the spirit of FERPA, Family Education Rights and Privacy Act,
20 U.S.C. §1232g; 34 CFR Part 99. The Act provides for the protection of the privacy of
students' educational records. Whereas this action will require the inspection of student records
of all student parties herein. Plaintiffs herein seek to protect the identity of all listed student
parties by using pseudonyms.

Page 1 of 58



BYRNES, Individually and as an employee of the
Town of Montgomery Police Department; TOWN OF
MONTGOMERY POLICE DEPARTMENT; and TOWN
OF MONTGOMERY; Unknown Students 1-100;
Unknown Teachers 1-100; Unknown Administrators 1-100;
Unknown Lunch Aides 1-100, the exact names and identities
of whom are not presently known,

                              Defendants.

-------------------------------------------------------------------x

## INTRODUCTION

1.     Plaintiffs' claims arise out of the serious misconduct of the defendants directed

       towards the plaintiff DC.

2.     Plaintiffs' claims arise out of defamatory statements made by the defendants

       concerning the plaintiff DC, violation of first amendment rights, hate speech and

       threats of violence made against the plaintiff DC by his fellow students, selective

       enforcement of the code of conduct, rules and regulations of the defendant, and

       defendants' failure to prevent, investigate, deter or credit the effect these matters

       had on plaintiff DC.

3.     Plaintiffs' claims include, but are not limited to: Defamation; Violations of

       plaintiffs' civil rights under both the state and federal law; Violations of DC's civil

       rights as pursuant to Americans with Disabilities Act, 42 U.S.C.S. Section

       12203;Violation of plaintiffs' due process rights; Violation of the Equal Protection

       Clause of the 14th Amendment Of the United States Constitution and Title VI of

       the Civil Rights Act by reason of a racially hostile educational environment;

       Violations of plaintiffs' rights under IDEA and the Regulations of the NYS

       Commissioner of Education; Violations of DC's rights under the Rehabilitation

Act of 1973; Violations of DC's first amendment rights.

## JURISDICTION

4.    Jurisdiction is conferred pursuant to 28 U.S.C. §1343(3) and (4) which provides original jurisdiction in this Court on all suits brought pursuant to 42 U.S.C. §1983 and 28 U.S.C. §1331, which provides jurisdiction to all matters brought pursuant to the United States Constitution and laws of the United States.

5.    Jurisdiction is also conferred pursuant to 42 U.S.C. §2000d-7, Civil Rights Remedies Equalization Act, for violations of 42 USC §2000d, Title VI of the Civil Rights Act of 1964, and for discrimination by recipients of Federal financial assistance;

6.    In addition, plaintiffs respectfully request that this Court invoke its supplementary jurisdiction over Plaintiffs' state law causes of action pursuant to 28 U.S.C. §1367(a).

7.    An application for permission to serve a late notice of claim with respect to Plaintiffs' state claims has been filed and is presently pending before the Hon. Robert A. Onofry, ASCJ, in the Supreme Court of the State of New York, County of Orange, Index No. 8756/09, in a proceeding entitled "In the Matter of the Application of TC and KC, Individually, and as Parents of DC, a minor under the age of eighteen (18) years, Petitioners, against VALLEY CENTRAL SCHOOL DISTRICT, VALLEY CENTRAL SCHOOL DISTRICT BOARD OF EDUCATION, and TOWN OF MONTGOMERY POLICE DEPARTMENT."



## ACTORS

8.    Plaintiff DC is a citizen of the United States of America. At the time of the events that led up to this Complaint, DC was a resident of Walden, NY, and was a student who was enrolled in the Valley Central High School, a school within the control of defendant, VALLEY CENTRAL SCHOOL DISTRICT and/or VALLEY CENTRAL SCHOOL DISTRICT BOARD OF EDUCATION.

9.    Plaintiff TC is a citizen of the United States of America, and at the time of the events that led up to this Complaint, was a resident of Walden, NY. He is the natural father and a lawful guardian of Plaintiff DC.

10.    Plaintiff KC is a citizen of the United States of America, and at the time of the events that led up to this Complaint, was a resident of Walden, NY. She is the natural mother and a lawful guardian of Plaintiff DC.

11.    Defendant VALLEY CENTRAL SCHOOL DISTRICT (hereinafter "DISTRICT" or "VCSD") is a local school district which serves students in parts of Orange County, including the Towns of Walden, Montgomery, Newburgh and Maybrook, and whose district office is located at 1175 State Route 17K, Montgomery, New York.

12.    Defendant VALLEY CENTRAL SCHOOL DISTRICT BOARD OF EDUCATION (hereinafter "BOARD OF EDUCATION" or "BOE") is the Board of Education for the above mentioned VALLEY CENTRAL SCHOOL DISTRICT, with an office located at 1175 Route 17K, Montgomery, New York.

13.    Defendant RICHARD M. HOOLEY (hereinafter "HOOLEY" or "SUPERINTENDENT") is the Superintendent of Schools of VCSD. At all

relevant times Defendant HOOLEY was acting under color of state law and within the scope of his capacity as Superintendent of Schools of VCSD.

14.    Defendant JOANNE AVELLA (hereinafter "AVELLA") was the former acting school principal of Valley Central High School within VCSD at the time of some of the events that led to this Complaint.  At all times relevant Defendant AVELLA was acting under color of state law and within the scope of her capacity as acting school principal of Valley Central High School.

15.    Defendant DR. DEBRA M. LYNKER (hereinafter "LYNKER") was former acting Interim Principal of Valley Central High School within VCSD at the time of some of the events that led to this Complaint.  At all times relevant Defendant LYNKER was acting under color of state law and within the scope of her capacity as Interim School Principal of Valley Central High School.

16.    Defendant THOMAS BALDUCCI (hereinafter "BALDUCCI") is a Vice-Principal of Valley Central High School within VCSD.  At all times relevant Defendant BALDUCCI was acting under color of state law and within the scope of his capacity as Vice-Principal of Valley Central High School.

17.    Defendant JOSEPH DI MAIO (hereinafter "DI MAIO") is a Vice-Principal of Valley Central High School within VCSD.  At all times relevant Defendant DI MAIO was acting under color of state law and within the scope of his capacity as Vice-Principal of Valley Central High School.

18.    Defendant BRIAN GIUDICE (hereinafter "GIUDICE") was a former Vice-Principal of Valley Central High School within VCSD at the time of some of the events that led up to this Complaint.  At all times relevant Defendant GIUDICE was acting

under color of state law and within the scope of his capacity as Vice-Principal of Valley Central High School.

19. Defendant GLENN TAYLOR (hereinafter "TAYLOR") is a Guidance Counselor at Valley Central High School within VCSD. At all times relevant Defendant TAYLOR was acting under color of state law and within the scope of his capacity as Guidance Counselor at Valley Central High School.

20. Defendant MAJOR ROBERT "BOB" BOULDIN (hereinafter "MAJOR BOULDIN") is Senior Army Instructor of Valley Central JROTC located within Valley Central High School within VCSD. At all times relevant Defendant MAJOR BOULDIN was acting under color of state law and within the scope of his capacity as Senior Army Instructor at Valley Central High School.

21. Defendant SERGEANT PATRICK T. WIMMER (hereinafter "SGT. WIMMER") is an Army Instructor of Valley Central JROTC located within Valley Central High School within VCSD. At all times relevant Defendant SGT. WIMMER was acting under color of state law and within the scope of his capacity as Army Instructor at Valley Central High School.

22. Defendant OFFICER KENNETH BYRNES (hereinafter "OFFICER BYRNES") is an employee of the TOWN OF MONTGOMERY and/or TOWN OF MONTGOMERY POLICE DEPARTMENT, and was acting as School Resource Officer of Valley Central High School within VCSD. At all times relevant Defendant OFFICER BYRNES was acting under color of state law and within the scope of his capacity as School Resource Officer of Valley Central High School, and as an officer of the Town of Montgomery Police Department.

23. Defendant TOWN OF MONTGOMERY POLICE DEPARTMENT (hereinafter "MPD") is under the control of defendant TOWN OF MONTGOMERY, a municipality located in the State of New York, with offices at 110 Bracken Road Montgomery, NY 12549.

24. Unknown and unnamed student actors perpetrated the threats of violence upon plaintiff DC and plaintiff KC, in the cafeteria, hallway and a bathroom located in the Valley Central High School, outside the Valley Central High School while plaintiff DC was attempting to or after he boarded a bus, and in other places on school grounds.

25. Unknown and unnamed teachers at VCSD. At all relevant times Unknown Defendant teachers were acting under color of state law and within the scope of their capacity as employees of VSCD.

26. Unknown and unnamed lunch aides at VCSD. At all relevant times Unknown Defendant lunch aides were acting under color of state law and within the scope of their capacity as employees of VSCD

27. Unknown and unnamed administrators of VCSD. At all relevant times Unknown Defendant administrators were acting under color of state law and within the scope of their capacity as employees of VCSD.

## FACTS ON WHICH THE PLAINTIFFS' CLAIMS ARE BASED

27. At all times herein mentioned, DC was a student of the Valley Central High School.

28. On or about October 28, 2008 DC was confronted by a minority student "DS" in the cafeteria during his 8th period lunch in an aggressive manner unprovoked by

DC.

29.    Enroute to his 9th period class on October 28, 2008, DC was again confronted in the hallway by several minority students [including "DS" and "WB"] in an aggressive manner, who called DC "whiteboy", "cracker" and other derogatory names, and threatened to beat up and kill DC and to kill DC's mother and "cut her" or harm her in some way.

30.    The hallway incident occurred in the presence of hall monitors, Mr. Sherry and Mr. Wilkinson, at least one teacher, Science Teacher Anna Leo, and several students, including "KG" and "KM", thus placing VSCD on notice of the threats of violence and violence being directed towards plaintiff DC.

31.    The aforesaid "DS" and "WB" pursued DC even after he was pulled into a classroom by the Science Teacher, Anna Leo, and the door was locked.

32.    Vice Principal Thomas Balducci made DC write up what happened in the cafeteria and the hallway, but Plaintiffs have never been provided with a copy or an opportunity to review what was written by DC, despite their requests for the same.

33.    The actual details of the hallway incident were never disclosed by the school administration to DC's parents, even though serious threats of harm and an actual attempt to assault DC had occurred there. Instead, the school focused only on the cafeteria incident when speaking to Plaintiffs.

34.    Following the hallway incident, Vice Principal Thomas Balducci and then Principal Joanne Avella wrongfully accused DC, and tried to coerce DC into admitting that he had used a racial epithet with regard to the minority students.

35.   Upon information and belief, Principal Avella was fired from her position as Principal at least in part because of these incidents.

36.   Upon information and belief, Principal Avella later sued VCSD and Superintendent Hooley in the United States District Court for the Southern District of New York for some form of civil rights and wrongful termination, in an action bearing Docket No. 09 CIV. 0923.

37.   DC denied using any racial slurs or racial epithets directed at the minority students who threatened him in the cafeteria and hallway.

38.   DC acknowledged that in the cafeteria he may have referred to a table of minority students as "Black kids", but that he did not use that word in a derogatory or discriminatory manner.

39.   On October 28th, 2008, while DC was in her office, then Principal Avella went into a speech about the use of the word "black" as being both inflammatory and derogatory, and how it was inappropriate to classify people that way, and that DC should refrain from using that word.

40.   At that time neither Vice Principal Thomas Balducci nor then Principal Avella commented on the use of "whiteboy" or "cracker" directed towards DC by the minority students.

41.   Despite the derogatory remarks, threats and attempted assault directed towards DC and KC (mother), no incident report was ever written up regarding either the aforesaid cafeteria or hallway incidents to Plaintiffs' knowledge.

42.   On October 29, 2008, TC, Plaintiff herein, and the parents/guardians of "KG" and "KM", two other Caucasian students who had only witnessed the cafeteria and



hallway incidents, were directed to come into the school to speak to then Principal Avella.

43.   It is not known as a matter of fact by Plaintiffs whether the parents of the minority students were also directed to go into the school to speak to then Principal Avella, nor do Plaintiffs have knowledge of what may have been said in such a meeting if it did take place. Plaintiffs do question why, if then Principal Avella did meet with the minority students and their parents and gave them the same stern warning given to the three Caucasian students, they continued to display threatening behavior toward DC with no discipline from the school.

44.   Then Principal Avella told TC, Plaintiff herein, who was present at the October 29, 2008 meeting with DC, then Principal Avella, Vice-Principal Thomas Balducci and Vice Principal Millicent Lee, that no one would be punished for the October 28th, 2008 incident (no overt reference was made regarding the hallway incident); that the school had taken proper steps to curb further inappropriate behavior; and that she expected all parties involved to stop any escalations stemming from the incident or they would be met with strict discipline from the school.  Vice Principal Thomas Balducci then told DC and his father they would "Bring down the hammer" if any further incidents occurred.

45.   During the October 29, 2009 meeting, then Principal Avella went into a diatribe which included the following remarks: "My heart goes out to the people who were oppressed for 200 years. You can't possibly know what it's like to be a person of color in America today."

46.   Then Principal Avella went on to state to DC in the presence of his father and



Vice Principals Balducci and Lee who were also present in the room, "Your ideas and morals are disgusting and anyone who believes in the things you do is a despicable human being".

47.  Then Principal Avella went on to state: "I have a white supremacist in my family. He's a complete hypocrite and ruins our holidays. We have to argue with him over the fact that he admires a black man he works with", and that when she challenges him about that he claims that "the man is not black." [Note the use of the word "black" by then Principal Avella.]

48.  Plaintiff TC stated during the October 29th, 2008 meeting with Principal Avella that while DC may have had issues last year, they had nothing to do with race.

49.  In or around May, 2008, DC had been reprimanded by Major Bouldin for reading Mein Kempf, a book which he had taken out of the school library. Major Bouldin had actually taken the book away from DC. DC shares his father's interest in military history, especially World War II and was taking a class on Military History that spring. He was reading the book to get a better understanding of the events he was learning about.

50.  In addition, former Vice-Principal Brian Giudice had the lock on DC's locker cut without his knowledge because he suspected that DC had drawings of German military symbols in his locker. They did not find anything, and there was no write up of either of these events in DC's record.

51.  Plaintiffs had a meeting at the time with then Vice Principal Brian Giudice and Major Bouldin in May of 2008 where they questioned Mr. Giudice as to why they had not just asked DC to open his locker, as he had nothing to hide.



52.    It was also during this May 2008 meeting that TC placed the District on notice that he believed that the District was wrongfully discriminating against TC, harassing him, and violating his first amendment rights.

53.    TC told both Mr. Giudice and Major Bouldin that it was DC's parents role to monitor and limit if necessary, what their son was reading, not the schools. He also pointed out that DC had gotten the book from the school library, not from home  This is an example of the harassment which had been directed towards DC without cause even before Principal Avella came to the high school.  Since Principal Avella became involved, the harassment escalated and was brought to a new level.

54.    DC had been enrolled in JROTC for four years in the Valley Central High School, and was considering a career in the military when he finished school. DC was forced to drop out of the JROTC program due to his suspension.

55.    During the October 29, 2008 meeting,  Vice Principal Millicent Lee, who is African American, confirmed that she had never experienced any issues regarding DC, and that he was always courteous and respectful of her.

56.    Then Principal Avella proceeded to state "Jesus was from one of the darker tribes of Israel, scripture says he had hair like wool.  Therefore he was most likely black."

57.    When Plaintiff TC asked her what that had to do with the matter at hand and the October 28, 2008 incidents where DC was the victim, then Principal Avella made no response.

58.    Plaintiffs placed the District on notice during the October 29, 2008 meeting with



Principal Avella of their belief that the District, its employees, agents and servants, that their actions and conduct constituted discrimination, defamation, harassment and resulted in a hostile educational environment.

59.  When the meeting was over, as Plaintiff TC and DC were leaving the office, then Principal Avella remarked to DC "Your blonde hair and blue eyes won't do you any good in prison. They'd toss you like a salad!"

60.  On Thursday, October 30, 2008, Officer Kenneth Byrnes of the Town of Montgomery Police Department, assigned to the Valley Central High School as a school resource officer, pulled DC out of class and told him that it would be a good idea not to attend the Friday night football game because there were rumors about retaliation.

61.  On that same date, Plaintiff TC received a call at home from Vice Principal Thomas Balducci who told Plaintiff that the administration had heard "rumors" about a possible retaliation if DC attended the Friday night football game.

62.  Plaintiff TC expressed his concern on the manner in which administration, who had told all parties "to cease and desist", was handling the situation, and questioned why the administration was not finding the source of the rumors and imposing appropriate punishment, in lieu of suggesting simply that DC not attend the football game.

63.  On Friday, October 31, 2008, Plaintiff TC requested a meeting with then Principal Avella and Major Bouldin (Sgt. Wimmer attended instead), during which he again expressed his concern over the manner in which the October 28th incidents and rumors of retaliation were being handled. He also asked Sgt.



Wimmer to bear witness to DC's character and that he was not an aggressive kid.

64.     Plaintiff TC remarked that he had discovered that the minority students involved in the cafeteria and hallway incident were on the football team, and questioned whether that entered into her decision not to punish them as the last game was to be held that night.

65.     Plaintiff TC left the office. Approximately ten minutes after he left the school on October 31, 2008, then Principal Avella left a message on his home phone that DC had been brought into the office. He later discovered DC was kept there until the end of the school day with no clear explanation why, and DC was not allowed to call his parents despite his numerous requests to do so.

66.     During the time DC spent in the office on October 31, 2008, he was verbally told that it was for his safety, but then Plaintiffs got a written referral sent home which indicated DC had been followed between classes and that he would be punished if he continued his "aimless wandering". This referral does not appear in DC's official school record which was provided to Plaintiffs and Plaintiff's lawyers.

67.     While in the office on October 31, 2008, DC was told by Vice Principal Joseph Di Maio in essence "the best thing you can do at this point is to go home." He was also told by then Principal Avella "Your opinions are not equal to ours, maybe they will be when you have a degree, until then you have no right to question myself or Mr. Di Maio."

68.     As DC went to get on the bus on October 31, 2008, two minority students ("DS" and "WB") who were involved in the cafeteria and hallway incidents stood

outside the bus taunting DC to get off the bus and fight.

69.   This bus incident was witnessed by Vice Principal Thomas Balducci who was in close proximity.  DC motioned to Mr. Balducci and stated "Do you see this?  This is what I'm talking about."  In response, Mr. Balducci only told the two students to move on.

70.   When Plaintiff TC returned home from work and learned of the bus incident, he called Mr. Balducci and questioned if the issue from earlier in the week was so incendiary, why hadn't he brought the two students who were taunting DC ("DS" and "WB") into the school to be dealt with by Principal Avella.

71.   Mr. Balducci's response was that he did not pursue it because there was another incident down the bus line.  When TC went to the school the next Monday and asked then Principal Avella if she had been notified of the bus incident,  she said that she had not.

72.   TC again, during his meetings with Mr. Balducci and Principal Avella, put the District on notice of plaintiffs' belief that the actions and conduct of the District, its employees, agents and servants, constituted discrimination, defamation, harassment and resulted in a hostile educational environment

73.   DC has severe ADHD which was diagnosed at age 5, and he has been on a Rehabilitation Act 504 Plan since 7th grade.  His grades and behavior are indicative of a student who is having difficulties due to his disability.  As of the December 5, 2008 incident discussed below, at which time DC was in the 12th Grade, his 504 Plan had not been reviewed or updated since 7th Grade despite his having received numerous "F's", and getting many discipline referrals for



disability related behavior over the years.

74.    At no time did the administration suggest adding a behavior modification plan to
his 504 Plan, nor suggest any meetings with the school psychologist or that any
further educational evaluations be conducted.

75.    Instead, the District has continually used punishment as the sole means of
handling DC's behavior, and made no attempt to help him.  DC has been told by
various teachers over the years that there is no such thing as ADHD or that he
does not have ADHD.

76.    Four incidents occurred during the month of October, 2008 where DC was the
victim of aggressive and threatening behavior by the same minority students,
however, no written incident reports were filed, and there was no punishment
imposed on the minority students.  However DC got his Lunch period moved
from 8th period to 5th period immediately after the cafeteria incident.

77.    Despite the fact that to Plaintiffs' knowledge no written incident report existed
regarding the October 2008 incidents, one of the incidents was brought up by
then Principal Avella at a subsequent  Superintendent's Hearing as "proof" that
DC was somehow dangerous to the student body of Valley Central High School,
despite the fact that DC was actually the victim in the October 28, 2008 cafeteria
and hallway incidents, and not the aggressor, and no students were ever
punished for the event.

78.    On December 5, 2008, DC was found in possession of a document which he and
a friend "JR" who is Hispanic wrote at home, containing lyrics to a rap song.  DC
had brought in a copy of the song solely to give it to "JR".



79.    According to Discipline Referral dated December 5, 2008 written by Major

Bouldin, he had reviewed the document and noticed several "racial statements".

When he confronted DC with the document, DC stated that they were song

lyrics.

80.    According to then Principal Avella's letter to Plaintiffs dated December 5, 2008,

DC was "exhibiting disruptive behavior" when he was "observed during first

period class, showing students a document that he wrote containing racial slurs,

epithets, and inflammatory remarks", in violation of the Valley Central School

District Code of Conduct and the High School Discipline Code contained within

the Student Handbook.

81.    As a result, DC was immediately suspended, the official notice said for five days,

from December 8, 2008 through December 12, 2008, but his suspension actually

began around 8:00 A.M. on December 5, 2008. The suspension began before

the claiming parents received written notice of the suspension, and had lasted

six days before the Superintendent had made his decision to suspend DC for 7

months.

82.    The Notice of Suspension provided to the parents dated December 5, 2008 was

inadequate and contrary to the due process rights of Plaintiffs herein, the New

York Education Law §3214 and Regulations of the NYS Commissioner of

Education, inasmuch as the decision to suspend DC was made without affording

Plaintiffs an opportunity for a prior informal conference during which they could

present DC's version of the events and question the complaining witnesses in

the presence of the principal.  There was no indication in the notice provided to



the parents that DC's presence in the school posed a continuing danger to persons or property or an ongoing threat of disruption to the academic process that required his immediate suspension.

83. Although the December 5th, 2008 letter sent to Plaintiffs does notify them that they have the right to request an "immediate informal conference with the high school administration", it failed to inform the Plaintiffs that they had a right to question the complaining witnesses which is provided by law.

84. In addition, then Principal Avella recommended to the Superintendent that DC be considered for suspension for a period in excess of five days.

85. Plaintiffs believe that the "five" day immediate suspension was not an appropriate consequence of DC's actions on December 5, 2008, and they dispute the actions taken by VCSD that led up to the event and which followed the event, that would subsequently result in DC's being suspended for the remainder of the school year.

86. Upon information and belief, at no time was "JR", the Hispanic student who co-authored the rap song, ever questioned by School officials or punished in any way.

87. In a memo sent from then Principal Avella to the Superintendent asking for a hearing, she referred to the past incidents in October, 2008 where DC was the victim which do not appear anywhere in DC's anecdotal record and in no way were related to the Rap song incident of December 5th, 2008 and which then biased the superintendent before the hearing even began.

88. On December 11, 2008 a Superintendent's Hearing was held during which DC



plead not guilty to charges that "(1) he disrupted the classroom when he passed a document to another student in JROTC class; and (2) he created a situation that led school authorities to reasonably forecast a substantial disruption, when he passed a document containing racially-charged and hostile language to another student and/or left the document in a location where it was accessible to others".

89.    At the conclusion of the testimony and after the hearing had officially ended, during parent's discussion with the Superintendent, TC remarked that claiming parents realized that due to DC's disability that he had numerous referrals in the past, but that all they ever asked for was that the school be fair in dealing with their son, to which Superintendent Hooley responded, "Life isn't fair.

90.    Later on December 11, 2008, the matter was referred to the 504 Committee for a Manifestation Determination to review whether DC's behavior was a result of his disability.  This referral was made after the school's presentation of their case against DC in the Superintendent's Hearing, but before the Superintendent had notified Plaintiffs of his finding of "Guilt", and only after KC, Plaintiff herein, had remarked after the hearing that DC suffered from ADHD.  The Superintendent responded to Plaintiffs with the comment "You think he has ADHD".

91.    The parents received no prior written notice of the 10:00 A.M. Manifestation Determination meeting to be held on December 12, 2008, but instead were notified by phone the afternoon of December 11th, 2008, leaving them no time to prepare or obtain pertinent records.

92.    The December 12, 2008 Manifestation Determination Meeting was a sham,



based on an inadequate and outdated evaluation of DC done before he entered the Valley Central School District, more than eight years prior to the meeting.

93.    The parents were not provided with a notice of their 504 Due Process and Procedural Rights, and not given an opportunity to review his records;

94.    The only person at the hastily called Manifestation Determination meeting, other than DC's parents, who might have had some understanding of the effects of ADHD on DC's behavior, was the school psychologist, who admitted that she had never met DC.  No special education teachers were present.

95.    There was no formal re-evaluation conducted in connection with the Manifestation Determination Meeting by the 504 Committee that parents were privy to, only a rehashing of the charges against DC and a cursory review of his 504 Plan which had just been reviewed and updated prior to the start of the Manifestation Determination Meeting, since it had not been reviewed or updated since before DC had entered the high school more than four years before.

96.    No formal Manifestation Determination was reached by the 504 Committee while parents were present.  Parents were told to leave and received a phone call later that day at 12:30 P.M. advising them that the Committee had found no nexus between DC's disability and the December 5, 2008 incident.

97.    Upon information and belief, the "no nexus" decision had already been made when the 504 Committee had reconvened with DC's parents via a conference call, but with then Principal Avella also present.

98.    The "no nexus" decision was made despite the fact that the 504 Committee had just met prior to the Manifestation Determination Meeting and determined that a



Behavior Plan should be added to DC's 504 Plan. The school never followed

through on that due to DC's suspension for the rest of the school year.

99.   In fact, VCSD, its employees and agents, lied to the parents regarding their right

to a due process hearing which parents immediately requested during the call

when they were informed of the "no nexus" decision.

100.  Parents were never informed as to how the "no nexus" decision was reached

and the reasons therefor.

101.  When parents received the written report of the December 12th Manifestation

Determination Meeting dated December 15th, 2008, they noticed numerous

inaccuracies and misstatements in the document. Plaintiff TC called to inform

504 Chairperson, Vice Principal Joseph Di Maio, who refused to make any

corrections.

102.  In making the decision dated December 22, 2008 to suspend DC for the

remainder of the school year, Superintendent Hooley indicated that he had also

considered DC's anecdotal record, and what he deemed was DC's "history and

notoriety in the school" which "reasonably forecasts a substantial disruption

based on the racially charged and hostile language in the document."

103.  In HOOLEY's letter dated December 22, 2008 he clearly insinuates and

suggests that DC is a racist, white supremacist, bigot and a liar.

104.  It was made clear by the Superintendent in his letter dated December 22, 2008

that he had considered all of the incidents listed in the anecdotal record in his

setting of punishment, even though most of the incidents were clearly related to

DC's ADHD and should not have been considered at all, as a "nexus"



determination had not been made for any of them.

105.   Furthermore, the anecdotal record was not accurate, and listed, for example, a burglary charge that never occurred.

106.   When Petitioners confronted the school regarding the error, they were told that it was a "Typo" but the record was not corrected prior to the Superintendent's Hearing, and the inaccurate record was considered by the Superintendent.

107.   In addition, when determining DC's guilt, the Superintendent considered statements made during the hearing by Joanne Avella, then Principal of the High School, regarding the October, 2008 incidents which were never officially reported and investigated, based solely on what Joanne Avella believed the facts were, and her mistaken and erroneous belief that DC was a racist or white supremacist with absolutely no shred of evidence, and without affording DC an opportunity to properly defend himself.

108.   In addition, a witness at the hearing, Sgt. Wimmer lied under oath when he testified that DC had used the "n" word back in October, 2008. Since no school official had actually witnessed the cafeteria incident and the incident was never written up, he had no direct knowledge of same, and DC has continually denied that he used that word. [Sgt. Wimmer had also in the past told DC that he did not have ADHD and that he just needed to "get beat more"].

109.   Major Bouldin, who was also a witness at the hearing, claimed that he thought that the rap lyrics that DC wrote represented how DC actually thought and felt, but gave no factual basis for his comment. He was also allowed by the



Superintendent to introduce prejudicial  past behavior, some of which was not even in DC's record [i.e. reading Mein Kempf] over the objection of the parent.

110.   Upon being suspended for the rest of the school year, DC was not eligible for tutoring, nor was he permitted to attend graduation, the prom, the senior trip, or the Valley Central Summer School Program. Furthermore, he was unable to continue his participation in JROTC and lost his ability for a military career.

111.   Parents' engaged a local  attorney who filed an appeal of the Superintendent's Decision with the Board of Education on January 6, 2009.

112.   The Board of Education denied the appeal and upheld the Superintendent's Decision without providing any explanation for their decision.

113.   Following plaintiff DC's suspension from school, plaintiffs had plaintiff DC examined, and the rap song in question reviewed, by an expert psychiatrist who is of the opinion that DC is not and was not a racist, and that the song was not intended to be a racial slur/epithet nor in any manner derogatory or inflammatory aimed at any individual or ethnic group.

114.   Plaintiffs' expert psychiatrist is also an expert in race relations.

115.   In the months following the January, 2009 School Board Decision, Plaintiff TC made numerous contacts with the school, both in person and by phone in order to: (1) Obtain additional school records; (2) Clean out DC's locker; (3) Obtain and return school work necessary for DC to get his diploma; (4) Request a tutor for DC as he was unable to complete his Math without proper instruction and was subsequently failing in this subject.  Plaintiff was told multiple times by various school officials that DC could just drop Math as he did not need it to graduate.

Requests for a tutor were flatly denied, and the Plaintiffs were told they could pay themselves to get DC help with his math;    (5) Request on 4/20/09 that the Superintendent revisit his decision in light of the fact that DC had been more than unjustly punished, was failing subjects due to lack of instruction, and because Principal Avella [DC's main accuser] had been fired by the District in January, 2009. This request was also flatly denied 4/24/09.

116.    Following DC's suspension, and in or about February, 2009, a death threat was written on one of the bathroom walls in the school stating "DC" will die 2/12/09.

117.    Parents were never advised by the district of the threat that had been made against their son's life despite the fact that Sgt. Wimmer had discovered it and reported it, and a photograph of the threat had been taken on February 10, 2009.

118.    According to written statement by Sgt. Patrick T. Wimmer dated June 4, 2009, he observed the statement on February 10, 2009 while using the lavatory next to room 139. The statement was removed the same day.

119.    The statement later reappeared above the same urinal and stated the same words and DC was advised of the same by one of the students at the Valley Central High School (not district administration).

120.    Upon knowledge of this threat on April 27, 2009, plaintiff TC reported the matter the next day to Mr. Glenn Taylor, Guidance Counselor, and Town of Montgomery Police Officer Kenneth Byrnes on April 28, 2009.

121.    Once Officer Byrnes had verified the threat was present, he indicated he would put the matter on his "Blotter" but no formal police report was filed, despite Plaintiffs' insistence that one should be. No one at the High school, including



Officer Byrnes, alerted the Plaintiffs that there had been a similar threat made back in February, 2009.

122. There had also been a death threat made was in a hallway where the plaintiffs other two children attended the middle school and plaintiffs made the district aware of this.

123. It was only upon parents pursuing the matter and insistence that a formal report was filed on May 21, 2009, more than a month later.

124. Plaintiffs are not aware that any official police investigation took place, Officer Byrnes indicating in his report that he "was unable to locate any suspects" and that the "case was closed", and the "custodians were contacted and it was immediately removed and cleaned off".

125.  In early May, right after the second death threat had been reported by DC's parents, Superintendent Hooley called them saying he suddenly decided he would give DC a tutor 6 hours a week. This is after denying DC a tutor previously, even after Plaintiff TC told him as recently as 04/24/09 that DC was failing multiple subjects.

126. On  May 14, 2009, Plaintiffs wrote to Dr. Debra M. Lynker, Interim Principal of Valley Central High School, regarding the matter of the recent death threat,  and the October 2008 threats of bodily harm directed towards DC and his mother, and expressed their expectation that the District take the threats seriously and conduct an investigation.

127. On May 22, 2009, Plaintiffs met with Interim Principal Lynker to discuss the May 14, 2009 letter with counsel for the parents and the district present,   It was at this



meeting that the Plaintiffs found out there had been a previous death threat in February, 2009.

128. On June 1, 2009, parents wrote a follow-up letter to Interim Principal Lynker in which they inquired as to the status of the investigation.

129. On June 11, 2009, Interim Principal Lynker advised Plaintiffs that an "investigation" was done consisting of taking writing samples from all students in the JROTC and "other students of interest" (unspecified), and that there were no conclusive matches. The letter does not indicate who made that determination, and whether a handwriting analyst was employed.

130. The letter concludes with "We continue to monitor the area and check for any new graffiti". Plaintiffs point out the use of the word "graffiti" throughout Ms. Lynker's letter which downplays the incident and fails to recognize, given the past threats made against DC and Plaintiff KC, that the statement on the wall should have been taken seriously.

131. In addition to their concerns for their son DC, the claiming parents have other children, younger than DC in the District and fear for their safety. Plaintiffs sent Superintendent Hooley a letter dated July 6, 2009 expressing these concerns, including details of a recent incident that occurred in June, 2009 involving their 6th grade daughter.

**AS AND FOR A FIRST COUNT OF DEFAMATION
AGAINST DEFENDANTS VCSD, VCSD BOE,
AND AVELLA, HOOLEY, DI MAIO AND WIMMER
PLAINTIFFS ALLEGE AND SAY:**

132. Plaintiffs repeat, reiterate and reallege each and every allegations numbered "1"



through "131" of the within Complaint, with the same force and effect as though each were more fully set forth at length herein.

133. Defendants' negligently, recklessly or maliciously published false, defamatory statements of fact about Plaintiff DC, a private individual.

134. The numerous reckless, malicious and unsubstantiated falsehoods and unprivileged publications and false statements published by defendants include, but are not limited to:

a. On October 29, 2009,· Principal Avella stated to DC in the presence of his father and others present in the room, "Your ideas and morals are disgusting and anyone who believes in the things you do is a despicable human being" inferring that DC was a racist and/or white supremacist.

b. Principal Avella went on to state: "I have a white supremacist in my family. He's a complete hypocrite and ruins our holidays. We have to argue with him over the fact that he admires a black man he works with", and that when she challenges him about that he claims that "the man is not black."

c. When the meeting was over, as Plaintiff TC and DC were leaving the office, then Principal Avella remarked to DC "Your blonde hair and blue eyes won't do you any good in prison. They'd toss you like a salad!"

d. In HOOLEY's letter dated December 22, 2008 he clearly insinuates and suggests that DC is a racist, white supremacist, bigot and a liar.

e. Upon information and belief, AVELLA's unwarranted comments and WIMMER's false testimony during the Superintendent's Hearing, influenced HOOLEY's remarks and labeling of DC.



f.    Upon information and belief, HOOLEY had other discussions with AVELLA and others outside of the hearing and off the record.

g.    AVELLA made racially toned comments during the October 29, 2008 meeting indicating an active intent on the part of AVELLA to paint DC as a racist, even though the evidence indicated he was the victim.

h.    Write up by Mr. Jurgens regarding second death threat indicating that DC's name was brought up in his class when the class was discussing the idea of racism.

i.    HOOLEY's claim that DC was a liar without support in the record.

j.    HOOLEY's misstatement of a comment made by TC to DC during the Superintendent's Hearing.

k.    Di MAIO's write up of the Manifestation Determination Hearing notes misrepresenting and taking out of context comments made by TC and KC that we felt "that Valley Central School District has a problem with black students, insinuating that TC and KC are racists.

135.    The aforesaid statements were publicized to persons present at the October 29, 2009 meeting with then Principal Avella, including Plaintiff TC, Vice-Principal Thomas Balducci and Vice Principal Millicent Lee, and others within the VSCD.

136.    The Superintendent's letter dated December 22, 2008 was published to District employees.

137.    Defendants maliciously and recklessly made the aforesaid statements, suggestions, misstatements, innuendos, insinuations and inferences with such outrageous and reckless disregard and carelessness to their truth or falsity as to

indicate an utter disregard of the rights of the plaintiff DC.

138. Defendants' aforementioned statements, suggestions, misstatements, innuendos, insinuations and the inferences therefrom are defamatory and slanderous per se, in that they falsely attributed criminal, unethical, immoral, dangerous and improper conduct to plaintiff DC without justification or privilege, and in the absence of supporting facts.

139. Upon information and belief,  these defamatory statements put DC and his family at further risk of harm, and show an intent to harm them or have a wanton disregard for the harm that might occur from such statements and attitudes

140. Upon information and belief, the defendants' aforesaid statements were made by defendants with knowledge of their falsity and/or with reckless disregard for their truth or falsity.

141. Following plaintiff DC's suspension from school, plaintiffs had plaintiff DC examined, and the rap song in question reviewed, by an expert psychiatrist who is of the opinion that DC is not and was not a racist, and that the song was not intended to be a racial slur/epithet nor in any manner derogatory or inflammatory aimed at any individual or ethnic group.

142. Plaintiff's expert psychiatrist is also an expert in race relations

143. By defaming plaintiff DC and portraying him in a false light to students and school personnel, including teachers and administrators, in the VCSD and Valley Central High School, defendants irreparably injured the plaintiff DC's reputation and standing in the community, and maliciously, negligently, and inexcusably exposed plaintiff DC to contempt, ridicule, aversion and ostracism, and deprived him of the



confidence and free intercourse of society, and impeached his honesty, integrity, virtue and reputation.

144.  Defendants' campaign of defamation against plaintiff DC impaired and/or destroyed plaintiff DC's relationship and reputation with his fellow students and school personnel, including teachers and administrators, in the VCSD and Valley Central High School.

145.  Defendants' defamatory statements prejudiced the opinion of fellow students and school personnel, including teachers and administrators, in the VCSD and Valley Central High School, against plaintiff DC, and resulted in unfair and unwarranted bias, wrongful and unlawful suspensions of plaintiff DC, unprovoked assaults and attempted assaults, threats of violence and harm to plaintiff DC and his family.

146.  Plaintiff DC has suffered substantial injury as a result of Defendants' defamatory statements, including but not limited to, character and reputation, mental anguish, and loss of future opportunities.

**AS AND FOR A SECOND COUNT
VIOLATION OF PLAINTIFF DC'S
FIRST AMENDMENT RIGHTS
AGAINST DEFENDANTS VCSD, VCSD BOE,
HOOLEY, AVELLA, LYNKER, BALDUCCI, DI MAIO,
GIUDICE, TAYLOR, BOULDIN and WIMMER,
PLAINTIFFS ALLEGE AND SAY:**

147.  Plaintiffs repeat, reiterate and reallege each and every allegations numbered "1" through "146" of the within Complaint, with the same force and effect as though each were more fully set forth at length herein.

148.  Student life at Valley Central High School is governed in part by the Student



Handbook and the Code of Conduct, as well as by other policies adopted by the VCSD Board of Education.

149. The Student Handbook and Code of Conduct details the administrative policies as well as regulations on student behavior, including student language.

150. On December 5, 2008, DC was found in possession of a document which he and a friend "JR" who is Hispanic wrote at home, containing lyrics to a rap song. DC had brought in a copy of the song solely to give it to the co-author, "JR".

151. According to Discipline Referral dated December 5, 2008 written by Major Bouldin, he had reviewed the document and noticed several "racial statements". When he confronted DC with the document, DC stated that they were song lyrics.

152. According to then Principal Avella's letter to Plaintiffs dated December 5, 2008, DC was "exhibiting disruptive behavior" when he was "observed during first period class, showing students a document that he wrote containing racial slurs, epithets, and inflammatory remarks", in violation of the Valley Central School District Code of Conduct and the High School Discipline Code contained within the Student Handbook.

153. Plaintiff was initially suspended for five days and the matter was referred to the Superintendent for a Disciplinary Hearing.

154. On December 11, 2008 a Superintendent's Hearing was held during which DC plead not guilty to charges that "(1) he disrupted the classroom when he passed a document to another student in JROTC class; and (2) he created a situation that led school authorities to reasonably forecast a substantial disruption, when he passed a document containing racially-charged and hostile language to another



student and/or left the document in a location where it was accessible to others".

155.   In a decision dated December 22, 2008 defendant HOOLEY suspended DC for the remainder of the school year, holding that he had also considered DC's anecdotal record, and what he deemed was DC's "history and notoriety in the school" which "reasonably forecasts a substantial disruption based on the racially charged and hostile language in the document."

156.   Parents' engaged a local attorney who filed an appeal of the Superintendent's Decision with the Board of Education on January 6, 2009.

157.   The Board of Education denied the appeal and upheld the Superintendent's Decision without providing any explanation for their decision.

158.   The Student Handbook and Code of Conduct expressly purports to prohibit "Use of racial slurs/epithets; derogatory or inflammatory remarks concerning gender, age, sexual orientation, ethnic or religious association."

159.   The Student Handbook and Code of Conduct does *not* define operative terms such as "racial slurs/epithets" or "derogatory or inflammatory remarks" proscribed therein.

160.   Accordingly, the school policy is overly broad and vague, and violates plaintiff DC's first amendment rights.

161.   As written and undefined, the school policy vests unfettered discretion in the hands of school officials and teachers in violation of plaintiff DC's rights to free speech and free expression.

162.   Students do not forfeit their First Amendment Rights when they enter public schools.



163.  Defendants, acting under color of state law and according to policy and practice, have enacted regulations in the Valley Central High School Student Handbook and Code of Conduct that are both vague and over broad and have therefore deprived the plaintiff DC of his clearly established due process rights guaranteed by the Fourteenth Amendment to the United States Constitution and his clearly established rights to freedom of speech and expression secured by the First Amendment to the United States Constitution.

164.  Following plaintiff DC's suspension from school, plaintiffs had plaintiff DC examined, and the rap song in question reviewed,  by an expert psychiatrist who is of the opinion that DC is not and was not a racist, and that the song was not intended to be a racial slur/epithet nor in any manner derogatory or inflammatory aimed at any individual or ethnic group.

165.  Plaintiff's expert psychiatrist is also an expert in race relations.

166.  Rather, the rap song co-authored by plaintiff DC and his fellow student "JR" was no more than a form of artistic and/or poetic expression, and attempt to mimic and emulate what is prevalent in mainstream rap music.

167.  DC had written more than thirty poems that had no racial tone, two of which were published in the High School Art Book, Revelation.

168.  DC routinely used writing as a form of artistic expression, and the rap song was just one of his many efforts to experiment with different ways of rhyming.

169.  In May, 2008, DC was reprimanded for reading "Mein Kempf", a book that he taken out of the school library.  This incident was used against him in the Superintendent's Hearing as "proof" that DC was a bigot/racist.



170.  By investigating and threatening plaintiff with discipline for an act of clearly
      constitutionally protected expression, among other things, defendants, acting
      under color of state law and according to policy and practice, have explicitly
      discriminated against the plaintiff DC, and chilled plaintiff's free expression, and
      deprived plaintiff of his clearly established rights to freedom of speech and
      expression secured by the First Amendment to the Constitution of the United
      States.

171.  Because of defendants' policies and actions, plaintiff has suffered and continues
      to suffer injury and irreparable harm, including but not limited to, loss of
      reputation, loss of opportunity, loss of educational opportunities, anxiety,
      emotional distress, humiliation, fear for safety, medical expenses, professional
      fees, and loss of funds to pay attorneys' fees unnecessarily expended and
      continuing to be expended as a result of all of the respondents' illegal conduct.

### AS AND FOR A THIRD COUNT OF VIOLATION
### OF PLAINTIFFS FEDERAL CIVIL RIGHTS
### (REVERSE DISCRIMINATION)
### AGAINST ALL THE DEFENDANTS NAMED HEREIN
### PLAINTIFFS ALLEGE AND SAY:

172.  Plaintiffs repeat, reiterate and reallege each and every allegations numbered "1"
      through "171" of the within Complaint, with the same force and effect as though
      each were more fully set forth at length herein.

173.  On or about October 28, 2008 DC was confronted by a minority student "DS" in
      the cafeteria during his 8th period lunch in an aggressive manner unprovoked by
      DC.

174.  Enroute to his 9th period class on October 28, 2008, DC was again confronted in



the hallway by several minority students [including "DS" and "WB"] in an aggressive manner, who called DC "whiteboy", "cracker" and other derogatory names, and threatened to beat up and kill DC and to kill DC's mother and "cut her" or harm her in some way.

175. The hallway incident occurred in the presence of hall monitors, Mr. Sherry and Mr. Wilkinson, at least one teacher, Science Teacher Anna Leo, and several students, including "KG" and "KM".

176. The aforesaid "DS" and "WB" pursued DC even after he was pulled into a classroom by the Science Teacher, Anna Leo, and the door was locked.

177. Following the hallway incident, Vice Principal Thomas Balducci and then Principal Joanne Avella wrongfully accused DC, and tried to coerce DC into admitting that he had used a racial epithet with regard to the minority students.

178. DC denied using any racial slurs or racial epithets directed at the minority students who threatened him in the cafeteria and hallway, although admitting that he may have referred to a table of minority students as "Black kids", but that he did not use that word in a derogatory or discriminatory manner.

179. On October 28th, 2008, while DC was in her office, then Principal Avella went into a speech about the use of the word "black" as being both inflammatory and derogatory, and how it was inappropriate to classify people that way, and that DC should refrain from using that word.

180. At that time neither Vice Principal Thomas Balducci nor then Principal Avella commented on the use of "whiteboy" or "cracker" directed towards DC by the minority students.



181.    Despite the derogatory remarks, threats and attempted assault directed towards DC and KC (mother), no incident report was ever written up regarding either the aforesaid cafeteria or hallway incidents to Plaintiffs' knowledge.

182.    On October 29, 2008, TC, Plaintiff herein, and the parents/guardians of "KG" and "KM", two other Caucasian students who had only witnessed the cafeteria and hallway incidents, were directed to come into the school to speak to then Principal Avella.

183.    It is not known as a matter of fact by Plaintiffs whether the parents of the minority students were also directed to go into the school to speak to then Principal Avella, nor do Plaintiffs have knowledge of what may have been said in such a meeting if it did take place. Plaintiffs question why, if then Principal Avella did meet with the minority students and their parents and gave them the same stern warning given to the three Caucasian students, they continued to display threatening behavior toward DC with no discipline from the school.

184.    Then Principal Avella told TC, Plaintiff herein, who was present at the October 29, 2008 meeting with DC, then Principal Avella, Vice-Principal Thomas Balducci and Vice Principal Millicent Lee, that no one would be punished for the October 28th, 2008 incident (no overt reference was made regarding the hallway incident); that the school had taken proper steps to curb further inappropriate behavior; and that she expected all parties involved to stop any escalations stemming from the incident or they would be met with strict discipline from the school. Vice Principal Thomas Balducci then told DC and his father they would "Bring down the hammer" if any further incidents occurred.



185.    Plaintiff TC asked then Principal Avella what punishment was or would be given
to the minority students who instigated the October 28, 2008 incidents, as they
were the aggressors.  Principal Avella refused to discuss the other students.

186.    On Thursday, October 30, 2008, Officer Kenneth Byrnes of the Town of
Montgomery Police Department, assigned to the Valley Central High School as a
school resource officer, pulled DC out of class and told him that it would be a
good idea not to attend the Friday night football game because there were rumors
about retaliation.

187.    On that same date, Plaintiff TC received a call at home from Vice Principal
Thomas Balducci who told Plaintiff that the administration had heard "rumors"
about a possible retaliation if DC attended the Friday night football game.

188.    Plaintiff TC expressed his concern on the manner in which administration, who
had told all parties "to cease and desist", was handling the situation, and
questioned why the administration was not finding the source of the rumors and
imposing appropriate punishment, in lieu of suggesting simply that DC not attend
the football game.

189.    On Friday, October 31, 2008, Plaintiff TC requested a meeting with then Principal
Avella and Major Bouldin (Sgt. Wimmer attended instead), during which he again
expressed his concern over the manner in which the October 28th incidents and
rumors of retaliation were being handled.  He also asked Sgt. Wimmer to bear
witness to DC's character and that he was not an aggressive kid.

190.    Plaintiff TC remarked that he had discovered that the minority students involved
in the cafeteria and hallway incident were are on the football team, and