Law Office of Peter D. Hoffman, P.C.
Peter D. Hoffman, Esq. (PH-8306)
Attorney for Plaintiffs
200 Katonah Avenue
Katonah, NY  10536
Phone:  (914) 232-2242
Facsimile:  (914) 232-2245

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Thomas Coleman, Karen Coleman, and DC[1],<br><br>                                 Plaintiffs,<br><br>           - against -<br><br><br>VALLEY CENTRAL SCHOOL DISTRICT; VALLEY CENTRAL SCHOOL DISTRICT BOARD OF EDUCATION; RICHARD M. HOOLEY, Individually and as Superintendent of the Valley Central School District; JOANNE  AVELLA, Individually and as Former Principal of Valley Central High School; DR. DEBRA M.LYNKER, Individually and as Former Interim Principal of Valley Central High School; THOMAS BALDUCCI, Individually, and as Vice Principal of  Valley Central High School; JOSEPH DIMAIO, Individually and Vice-Principal of Valley Central High School; BRIAN GIUDICE, Individually and  Former Vice-Principal of Valley Central High School; GLENN TAYLOR, Individually and as Guidance Counselor of Valley Central High School; MAJOR ROBERT "BOB" BOULDIN, Individually and as Senior Army Instructor of Valley Central JROTC; SERGEANT PATRICK T.WIMMER, Individually and as Army Instructor of Valley Central ROTC; Unknown Students 1-100; Unknown Teachers 1-100; Unknown Administrators 1-100;Unknown Lunch Aides 1-100, the exact names and identities of whom are not presently known,<br><br>                                 Defendants. | Docket No.<br>09-CIV-9036<br><br><br><br>Plaintiff's Affidavit in Opposition to Defendants' Motions to Dismiss |

I, Karen Coleman, under penalty of perjury, depose and say:

----

[1] All student parties and actors herein are listed by pseudonym.  This is done to protect their privacy pursuant to and in the spirit of FERPA, Family Education Rights and Privacy Act, 20 U.S.C. §1232g; 34 CFR Part 99.  The Act provides for the protection of the privacy of students' educational records.  Whereas this action will require the inspection of student records of all student parties herein.  Plaintiffs herein seek to protect the identity of all listed student parties by using pseudonyms.

1. I am a Plaintiff in this matter. I have read all court papers and have personal knowledge of all the facts enumerated below.

2. I make this affidavit in opposition to Defendants' motions to dismiss.

3. I live at 177 Coleman Road, Walden, New York, with my husband, Thomas Coleman (hereinafter "TC") and my 3 children. I am the mother of Plaintiff DC.

4. In May of 2008, my son, DC was reprimanded by Major Bouldin for reading Mein Kempf, which he had checked out of the school library. Major Bouldin then took the book away from DC, even though he was reading the book to get an understanding of the topic he was learning about in his Military History class.

5. Soon after, Former Vice-Principal Giudice had the lock on DC's locker cut without his knowledge because he suspected DC had drawings of German military symbols in his locker. Nothing was found, and there was no write up of either of these events in DC's record.

6. At a meeting in May 2008, TC questioned Former Vice-Principal Giudice as to why he did not ask DC to just open his locker. TC also told Major Bouldin that is was our responsibility to oversee what our son was reading, not the school's.

7. It was at this meeting that TC put the District on notice that we believed they were wrongfully discriminating against DC, harassing him and violating his First Amendment rights.

8. On October 28, 2008, DC was aggressively confronted by a minority student "DS" in the cafeteria during his 8th period lunch. Then on his was to 9th period class, that same day, he was again aggressively confronted in the hallway by several minority students

(including "DS" and "WB"), who called DC "whiteboy", "cracker", and other derogatory names, and threatened to beat him up and kill both DC and myself, and to "cut" me or harm me in some way.

9.     This incident was witnessed by hall monitors and at least one teacher, Anna Leo, who pulled DC into a classroom and locked the door, to protect him from the threatening students.

10.    TC and I were never informed by the school about the hallway incident on October 28, 2008.  School officials only focused on the cafeteria incident.

11.    After the hallway incident, Vice Principal Balducci and then Principal Avella accused DC, and tried to make him admit that he used racial epithets regarding the minority students.  DC denies using any racial slurs or racial epithets against the minority students who threatened him in the cafeteria and hallway.

12.    On October 28, 2008, while DC was in her office, then Principal Avella lectured DC about the use of the word "black" and how inappropriate it was to classify people that way.  At no time did then Principal Avella or Vice Principal Balducci comment on the use of "whiteboy" or "cracker" directed towards DC.

13.    At a meeting on October 29, 2008, then Principal Avella expressed to TC and DC her sympathies regarding the oppression that people of color had experienced in the past. She went on to inform DC, in front of TC and Vice Principals Balducci and Lee that "your ideas and morals are disgusting and anyone who believes in the things you do is a despicable human being" and then she spoke of a white supremacist in her family.

14.    During that meeting on October 29, 2008, Principal Avella stated that the no one would

be punished for the October 28, 2008 incident. Still nothing was said about the hallway incident. Vice Principal Balducci informed DC and TC that they would "bring down the hammer" if any further incidents occurred.

15. TC stated that while DC had some previous behavioral issues the previous year, they had nothing to do with race.

16. During the October 29, 2008 meeting, Vice Principal Lee, who is African American, confirmed that she had never had any problems with DC, and that he was always courteous and respectful of her.

17. Then Principal Avella told DC that "Jesus was from one of the darker tribes of Israel, scripture says he had hair like wool. Therefore he was most likely black."

18. When TC asked her what that had to do with the October 28, 2008 incidents in which DC was the victim, not the aggressor, then Principal Avella had no response.

19. TC put the District on notice, during the October 29, 2008 meeting with then Principal Avella, that we believed the actions and conduct of the District and its employees, directed at our son, DC, constituted discrimination, defamation, harassment and resulted in a hostile educational environment.

20. As TC and DC were leaving the office after the meeting, then Principal Avella told DC "Your blonde hair and blue eyes won't do you any good in prison. They'd toss you like a salad!"

21. On Thursday, October 30, 2008, Officer Kenneth Byrnes of the Town of Montgomery Police Department, assigned to the Valley Central High School as a school resource officer, pulled DC out of class and told him that it would be a good idea for him not to

attend the Friday night football game because there were rumors about retaliation.

22.     Officer Byrnes had also told "KG", a white student who had witnessed the hallway
        incident, that he should not attend the Friday night football game because of the rumors
        of retaliation.

23.     On that same date, TC received a call at home from Vice Principal Balducci stating that
        the administration had heard "rumors" about a possible retaliation if DC attended the
        Friday night football game.

24.     TC expressed concern regarding the manner in which the administration, who had told
        "all parties" to cease and desist, was handling the situation.  He questioned why the
        administration was not trying to find the minority students who were believed to be the
        source of the threats so that appropriate punishment could be imposed, in lieu of directing
        that DC not attend the football game.

25.     On Friday, October 31, 2008, TC requested a meeting with then Principal Avella and
        Major Bouldin (Sgt. Wimmer attended instead), during which he again expressed his
        concern over the manner in which the October 28th incidents and the October 30th threats
        of retaliation were being handled.  He also asked Sgt. Wimmer to bear witness to DC's
        character and that he was not an aggressive kid.

26.     TC remarked that he had learned that the minority students involved in the cafeteria and
        hallway incident were on the football team, and asked whether that was why the District
        did not to punish them since the last football game was to be held that night.

27.     Approximately ten minutes after TC left the school on October 31, 2008, then Principal
        Avella left a message on our home phone stating that DC had been brought into the

office. We later learned that DC was kept there until the end of the school day with no

clear explanation why, and that DC was not allowed to call his parents despite many

requests to do so.

28.   During the time DC spent in the office on October 31, 2008, he was told that it was for

safety reasons, but then we received a written referral sent home which indicated plaintiff

DC had been followed between classes and that he would be punished if he continued his

"aimless wandering". This referral does not appear in DC's official school record, which

was provided to us and our attorneys.

29.   While in the office on October 31, 2008, DC was told by Vice Principal DiMaio that "the

best thing you can do at this point is to go home." He was also told by then Principal

Avella "Your opinions are not equal to ours, maybe they will be when you have a degree,

until then you have no right to question myself or Mr. DiMaio."

30.   As DC went to get on the bus on October 31, 2008, two minority students ("DS" and

"WB") who were involved in the previous cafeteria and hallway incidents stood outside

the bus taunting DC to get off the bus and fight.

31.   This bus incident was witnessed by Vice Principal Balducci. DC motioned out the bus

window to Mr. Balducci and stated "Do you see this? This is what I'm talking about."

In response, Mr. Balducci only told the two minority students to move on.

32.   When TC returned home from work and learned of the bus incident, he called Mr.

Balducci and questioned if the issue from earlier in the week was so incendiary, why

hadn't he brought the two minority students who were taunting plaintiff DC ("DS" and

"WB") into the school to be dealt with by Principal Avella.

33.     Mr. Balducci's response was that he did not pursue it because there was another incident

        down the bus line.  When TC went to the school the next Monday, he learned from then

        Principal Avella that she had not been notified of the bus incident by Mr. Balducci.

34.     TC again, during his calls and meetings with Mr. Balducci and Principal Avella,

        informed the District of our belief that the actions, inactions and conduct of the District

        and its employees, directed towards DC, constituted discrimination, defamation,

        harassment and resulted in a hostile educational environment.

35.     On December 5, 2008, DC, privately showed two friends a document containing song

        lyrics which he and a friend "JR," who is Hispanic, wrote at home.  DC then placed the

        paper face down on a table so that he could participate in class.  Defendant Wimmer then

        picked up the paper, reviewed its content, then handed it to defendant Bouldin.  When

        confronted, DC stated they were song lyrics.

36.     According to the Discipline Referral dated December 5, 2008 written by defendant

        Bouldin, the document contained several "racial statements".

37.     Furthermore, defendant Avella stated in a letter to TC and I, that DC was "exhibiting

        disruptive behavior" when he was "observed during first period class, showing students a

        document that he wrote containing racial slurs, epithets, and inflammatory remarks", in

        violation of the Valley Central School District Code of Conduct and the High School

        Discipline Code contained within the Student Handbook.

38.     Student life at VCHS is governed, in part, by the Student Handbook and Code of

        Conduct, and by other Board of Education policies.   It does not define or make any

        reference to the context in which the prohibited operative terms such as "racial

Page 7 of  14

slurs/epithets" or "derogatory or inflammatory remarks" are proscribed therein.
Furthermore, the movie "Ruby Bridges" is shown to 6th and/or 7th grade students in the
district. This movie is replete with racially charged language, even mentioning the "n"
word and "jigaboo", yet it continues to be shown to the children.

39.   As a result of the Discipline Referral dated December 5, 2008, defendant Avella
      immediately suspended DC for five days, according to the official notice, from December
      8, 2008 through December 12, 2008. However, DC's suspension actually began around
      8:00AM on December 5, 2008, before TC and I received written notice.

40.   DC was diagnosed at age 5 with severe ADHD, and has been on a 504 Plan since 7th
      grade. His grades and behavior are indicative of a student having difficulties due to his
      disability.

41.   As of the December 5, 2008 incident, at which time DC was in the 12th Grade, his 504
      Plan had not been reviewed or updated since 7th grade despite receiving numerous "F's"
      and many discipline referrals for disability related behavior over the years.

42.   Prior to December 5, 2008, the administration never suggested adding a behavior
      modification plan to DC's 504 Plan, nor did they suggest any meetings with the school
      psychologist or conduct educational evaluations.

43.   Instead, defendant District continually used punishment as the sole means of handling
      DC's behavior, with various teachers even going so far as to tell him that there is no such
      thing as ADHD or that he does not have ADHD, or that DC just needed "to get beaten
      more."

44.   On December 11, 2008, the matter was referred to the 504 Committee for a Manifestation

Determination to review whether DC's behavior on December 5, 2008 was a result of his disability. This referral was made after the school's presentation of their case against DC in defendant Hooley's Superintendent Hearing, but before defendant Hooley notified TC and I of his finding of "Guilt", and only after I remarked, after the hearing, that DC suffered from ADHD. To that, the defendant Hooley responded, "You think he has ADHD".

45.  We received no prior written notice of the 10:00 AM Manifestation Determination meeting to be held on December 12, 2008, but instead were notified by phone the previous afternoon, leaving us no time to prepare.

46.  The December 12, 2008 Manifestation Determination meeting was a sham, based on an inadequate and outdated evaluation of DC done before he entered the Valley Central School District, more than eight years prior to the meeting.

47.  We were not provided with a notice of our 504 Due Process and Procedural Rights, nor were we given an opportunity to review DC's records, contrary to law. The only person in attendance at the Manifestation Determination meeting, who might have had some understanding of the effects of ADHD on DC, aside from us, was the school psychologist, who admitted that she had never met DC.

48.  To our knowledge, no formal re-evaluation was ever conducted in connection with the Manifestation Determination meeting by the 504 Committee. Prior to December 12, 2008, DC's 504 Plan had not been reviewed or updated since before he entered high school more than four years before.

49.  We were notified by defendants DiMaio and Avella via telephone at 12:30 PM on

December 12, 2008 that the Committee had found no nexus between DC's disability and the December 5, 2008 incident.  Later that day, TC was informed during a telephone call from defendant Hooley, that DC was suspended for the remainder of the school year.

50.     The "no nexus" decision was made despite the fact that the 504 Committee had just met prior to the Manifestation Determination meeting and determined that a Behavior Modification Plan should be added to Plaintiff DC's 504 Plan.  The school never followed through on a behavior plan

51.     TC and I were never informed as to how the "no nexus" decision was reached and were, in fact, lied to by VCSD, its employees and agents regarding our rights to a due process hearing under Section 504 of the Rehabilitation Act which we immediately requested.

52.     Furthermore, TC and I found numerous inaccuracies in the written report we received, dated December 15, 2008, which 504 Chairperson, defendant DiMaio refused to correct.  For instance, defendant DiMaio wrongfully misquoted us in the Manifestation Determination meeting notes dated December 12, 2008 by documenting that we felt that VCSD had a problem with black students, intentionally insinuating that TC and I are racists.

53.     DC was initially suspended for five days, but as a result of the December 12, 2008 Manifestation Determination Meeting, defendant Hooley suspended DC for the remainder of the school year.

54.     In his letter dated December 22, 2008, which we did not receive until December 29, 2008, defendant Hooley made it clear that his decision to suspend DC for the remainder of the school year was based on all the incidents listed in the anecdotal record, even

though most of those incidents were clearly related to DC's ADHD and should not have
been considered at all, as a "nexus" determination had not been made for any of them.

55.     Once suspended, DC was denied eligibility for tutoring. TC made numerous contacts
with the school, requesting a tutor for DC as he was failing math. TC was informed that
DC could either drop math or TC could pay for the tutor himself.

56.     Upon his suspension, DC was not permitted to attend graduation, the prom, the senior
trip or the Valley Central Summer School Program. DC was also prevented from
continued participation in JROTC and thereby lost an opportunity to pursue a
commissioned military career.

57.     TC and I hired an attorney to assist with our appeal to the Board of Education. This
attorney turned out to be the personal attorney for the Board of Education president. He
never informed TC nor myself of his conflict of interest before or during the appeal
process. He was also ignorant of 504 law, requiring us to provide all 504 information to
him. We did not learn of his conflict until after the Board of Education appeal.

58.     In a letter dated January 13, 2009, the Board of Education denied our request for appeal
and upheld the Superintendent's decision without providing an explanation for their
decision.

59.     Following DC's suspension from school, TC and I had DC examined, and the rap song in
question reviewed, by expert psychiatrist, Milton C. Hollar, MD, who is of the opinion
that DC is not and was not a racist or white supremacist, and that the song was not
intended to be a racial slur/epithet nor in any manner derogatory or inflammatory aimed
at any individual or ethnic group.

60.   Dr. Milton C. Hollar is also an expert in race relations.

61.   In February, 2009, a death threat was written on one of the bathroom walls in the school stating "DC" will die 2/12/09.  Defendant district never advised us of the death threat; although Sgt. Wimmer discovered it and reported it, and a photograph was taken of the threat on February 10, 2009.  The threat was removed the same day.

62.   On April 27, 2009, TC and I learned of a second identical threat from a Valley Central High School student, not from anyone in the district administration.  TC reported the matter the next day to defendant Taylor, Guidance Counselor, and Town of Montgomery Police Officer Kenneth Byrnes.

63.   At some point after the first death threat, there was a write up by Mr. Jurgens, an English teacher, indicating that DC's name was brought up in his class during a discussion of racism.

64.   In early May, after the second death threat, defendant Hooley contacted TC and I, approving a tutor for DC, to work with him six hours a week.

65.   After much insistence by TC and I, a formal police report was finally filed on May 21, 2009, but we are unaware of any official police investigation ever taking place.

66.   At a meeting on May 22, 2009 with our counsel, defendant Lynker and counsel for defendant District, TC and I learned of the February death threat.

67.   On June 11, 2009, defendant Lynker advised TC and I that writing samples were taken of students in the JROTC and "other students of interest", but there were no conclusive matches.  The letter further stated that the school would "continue to monitor the area and check for any new graffiti."

68.    In our search for an attorney knowledgeable about civil rights and Special Education, TC
       and I were advised that the process would take a long time and DC was to graduate in
       June, 2009. Thus, no timely relief could be afforded to us as a result of the
       administrative process to remedy the defendant district's wrongs once DC had graduated.

69.    TC and I used due diligence in searching for an education attorney who could represent
       us in order to pursue our rights and claims, and did not locate and retain the Law Office
       of Peter D. Hoffman, P.C. until May 12, 2009.

70.    TC and I understand that the administration process is such that had we filed an impartial
       hearing demand in May, 2009 when we retained the Hoffman firm, it would have been
       more than likely that DC would have graduated before a final resolution of our claims
       would be rendered. We further understand that impartial hearings can be dragged on for
       many months before the hearing are completed, and only then can an impartial hearing
       officer render its decision.

71.    In the event that one party was dissatisfied with the decision of the Impartial Hearing
       Officer, and chose to appeal to the Office of State Review, that appeal would also take
       months, and DC would have been graduated long before a final resolution.

72.    Furthermore, Paul Kelly, who for some time has been the sole State Review Officer
       deciding appeals, has been under investigation for apparent bias against parents,
       habitually showing favor to the school districts.

73.    Ultimately, TC, DC and I decided that it would have been futile to pursue our
       administrative remedies given these facts.

WHEREFORE, I request that the defendants' motions to dismiss be denied in their entirety, and that TC, DC and I be awarded the costs of this motion, and such other and further relief as the Courts deems just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed at _Orange County, Newburgh_ , New York, June _9_ , 2010.
<sub>town of</sub>

Karen Coleman

_Karen Coleman_

Sworn to before me this

_9th_ day of June, 2010.

DANA M SANTONINE
Notary Public - State of New York
NO. 01SA6185190
Qualified in Orange County
My Commission Expires 4/N/2012