Law Office of Peter D. Hoffman, P.C.
Peter D. Hoffman, Esq. (PH-8306)
Attorney for Plaintiffs
200 Katonah Avenue
Katonah, NY 10536
Phone: (914) 232-2242
Facsimile:      (914) 232-2245

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Thomas Coleman, Karen Coleman, and DC[1], <br><br>                 Plaintiffs, <br><br>     - against - <br><br><br> VALLEY CENTRAL SCHOOL DISTRICT; VALLEY CENTRAL SCHOOL DISTRICT BOARD OF EDUCATION; RICHARD M. HOOLEY, Individually and as Superintendent of the Valley Central School District; JOANNE AVELLA, Individually and as Former Principal of Valley Central High School; DR. DEBRA M.LYNKER, Individually and as Former Interim Principal of Valley Central High School; THOMAS BALDUCCI, Individually, and as Vice Principal of Valley Central High School; JOSEPH DIMAIO, Individually and Vice-Principal of Valley Central High School; BRIAN GIUDICE, Individually and Former Vice-Principal of Valley Central High School; GLENN TAYLOR, Individually and as Guidance Counselor of Valley Central High School; MAJOR ROBERT "BOB" BOULDIN, Individually and as Senior Army Instructor of Valley Central JROTC; SERGEANT PATRICK T.WIMMER, Individually and as Army Instructor of Valley Central ROTC; Unknown Students 1-100; Unknown Teachers 1-100; Unknown Administrators 1-100;Unknown Lunch Aides 1-100, the exact names and identities of whom are not presently known, <br><br>                 Defendants. | Docket No. 09-CIV-9036 <br><br> **AFFIRMATION IN SUPPORT OF MOTION TO AMEND AND IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** <br><br> **REQUEST FOR ORAL ARGUMENT** |

_____

[1] All student parties and actors herein are listed by pseudonym. This is done to protect their privacy pursuant to and in the spirit of FERPA, Family Education Rights and Privacy Act, 20 U.S.C. §1232g; 34 CFR Part 99. The Act provides for the protection of the privacy of students' educational records. Whereas this action will require the inspection of student records of all student parties herein. Plaintiffs herein seek to protect the identity of all listed student parties by using pseudonyms.

I, Jamie Mattice, depose and swear:

1.      I am the attorney for the Thomas Coleman Karen Coleman, and DC;

2.      I am an attorney licensed and in good standing in New York;

3.      I maintain an office at 200 Katonah Avenue, Katonah, NY 10536;

4.      I make this affirmation in support of Plaintiff's Notice of Motion to Amend Plaintiff's

        Amended Complaint pursuant to Fed. R. Civ. P. 15, et seq. and in opposition to

        Defendants' Motions to Dismiss with personal knowledge;

5.      I am fully familiar with the facts and the law as it concerns this matter.

**I.      Second Amended Complaint**

6.      Plaintiff DC's parents originally brought this action on behalf of DC on the grounds of

        infancy, but he has now reached the age of 18 years;

7.      Plaintiffs wish to make a second amendment to the complaint by removing TC and KC,

        only in their capacity as DC's parents, from the caption;

8.      Plaintiffs wish to amend count one to Defamation per se on the second amendment to the

        complaint;

9.      Plaintiffs wish to amend count four, replacing "All Defendants" with the individually

        named defendants;

10.     I am hereto attaching the proposed Second Amended Complaint.

**II.     Opposition to Defendants' Motions to Dismiss**

11.     In or around May, 2008, plaintiff DC was reprimanded by defendant Bouldin for reading

        Mein Kempf, which he had checked out of the school library to learn more about the

        topic covered in the Military History class, in which he was then enrolled (¶¶ 48, 116,

187);[2]

12.   Furthermore, upon suspicion that plaintiff DC had drawings of German military symbols in his locker, defendant Giudice had the lock on DC's locker cut without his knowledge. They found nothing, and there was no write up of either of these incidents (¶¶ 49-50);

13.   On or about October 28, 2008 plaintiff DC was confronted by a minority student "DS" in the cafeteria during his 8th period lunch in an aggressive manner, unprovoked by DC (¶¶27, 192);

14.   En route to his 9th period class on October 28, 2008, plaintiff DC was again confronted in the hallway by several minority students [including "DS" and "WB"] in an aggressive manner, who called DC "whiteboy", "cracker" and other derogatory names, and threatened to beat up and kill DC and to kill DC's mother, plaintiff KC, and "cut her" or harm her in some way  (¶¶ 28, 193, 199);

15.   This hallway incident was witnessed by two hall monitors and at least one teacher, Anna Leo, who pulled plaintiff DC into a classroom and locked the door after the minority students continued to pursue DC (¶¶ 29, 195);

16.   Even though serious threats of harm and an actual attempt to assault plaintiff DC had occurred, the details of the hallway incident were never disclosed by school administration to DC's parents  (¶74);

17.   Following the hallway incident, defendants Balducci and Avella wrongfully accused plaintiff DC, and tried to coerce DC into admitting, that he used a racial epithet with

---

[2]  The symbol "¶" followed by a number refers to the corresponding paragraph contained in Plaintiffs First Amended Complaint.

regard to the minority students  (¶¶33, 196);

18.   While plaintiff DC admits questioning "what are the black kids laughing at", referring to

a table of African American students in the cafeteria, he did not use the word "black" in a

derogatory or discriminatory manner.  Furthermore, DC denies using any racial slurs or

racial epithets directed at the minority students who threatened him in the cafeteria or

hallway  (¶¶36, 37);

19.   During a meeting with plaintiff DC on October 28, 2008 in her office, defendant Avella

lectured DC about the use of the word "black" being both inflammatory and derogatory,

the inappropriateness of classifying people that way, and that DC should refrain from

using that word.  Neither defendants Avella nor Balducci commented on the use of

"whiteboy" or "cracker" directed towards DC by the minority students (¶¶ 33, 39);

20.   Despite the derogatory remarks, threats and attempted assault directed towards plaintiffs

DC and KC, no incident report was ever written up regarding either the aforesaid

cafeteria or hallway incidents to plaintiffs' knowledge;  (¶¶40, 200);

21.   During a meeting on October 29, 2008, defendant Avella continued her diatribe, going so

far as to tell DC about a white supremacist in her family then stating to DC that "[y]our

ideas and morals are disgusting and anyone who believes in the things you do is a

despicable human being"  (¶45);

22.   At this meeting, plaintiff TC stated that Plaintiff DC's behavioral issues the previous year

had nothing to do with race (¶47);

23.   Said minority students continued to display threatening behavior toward plaintiff DC with

no discipline from the school, although defendant Avella stated during this October 29,

2008 meeting that the school had taken proper steps to curb further inappropriate

behavior, and that she expected all parties involved to stop any escalation stemming from

the incident or they would be met with strict discipline from the school.  Defendant

Balducci added that they would "Bring down the hammer" if any further incidents

occurred  (¶¶ 63, 202, 210);

24.    As plaintiffs DC and Thomas Coleman (hereinafter "TC") were leaving this meeting,

defendant Avella stated "[y]our blonde hair and blue eyes won't do you any good in

prison.  They'd toss you like a salad!"  (¶59);

25.    Plaintiff DC suffered discrimination on account of his race by having his lunch period

moved from 8th period to 5th period immediately after the October 28th incidents and

eventually from school in its entirety  (¶¶20, 75, 192, 221);

26.    On October 30, 2008, Officer Kenneth Byrnes of the Town of Montgomery Police

Department, who is not a defendant, told plaintiff DC that it would be a good idea for him

not to attend the Friday night football game because there were threats of retaliation;

however, the minority students, who were on the football team, were not told to stay

home (¶208);

27.    On October 31, 2008, plaintiff DC was detained in defendant Avella's office and denied

the right to contact his parents.  He was also informed that he had no right to question

defendants Avella or DiMaio  (¶¶ 213-214);

28.    Plaintiff DC was again pursued and taunted that afternoon, as he got on his bus to go

home, by the two minority students involved in the October 28, 2008 incidents.  They

taunted DC to get off the bus and fight, which he did not.  This was witnessed, but not

documented, by defendant Balducci, who merely told the two minority students to move on  (¶¶ 69-70, 215-216);

29.     In a separate chain of events in October of 2008, substantial protest and press coverage arose over a school policy declaring it impermissible for students to wear scarves to the high school.  The basis for this measure was the district's desire to avert or reduce gang-related activities. (¶¶34-35) See **Exhibit "A"**, <u>Avella v. Valley Cent. Sch. Dist., Dr. Richard Hooley, Superintendent of Schools,</u> 90 Civ. 0923 (SDNY) at ¶¶ 10-11;

30.     With the onslaught of negative press, defendant Hooley attempted to distance himself from the policy, and instead defendant Avella alleges that he made her a scapegoat.  On December 16, 2008, defendant Hooley advised defendant Avella that at the January 26, 2009 Board of Education meeting he would seek approval for her termination; however, defendant Hooley had only hired defendant Avella on July 1, 2008. *Id.* at ¶¶  12, 27;

31.     Further alleged in defendant Avella's complaint against defendants VCSD and Hooley, was that defendant "Hooley withheld necessary support and training from her."  In addition, she alleges that defendant "Hooley failed to properly advise her of her duties and responsibilities with respect to the School Accountability Project nor provide her with written materials necessary to orient herself to or implement that project." *Id.* at ¶ 8-9;

32.     Defendant Avella's complaint goes on to allege that no reason provided by defendant Hooley "remotely justified the termination of her employment." *Id.* at ¶ 18;"

33.     While defendant District formally terminated defendant Avella on January 26, 2008, on January 6, 2009, defendant Board of Education approved the hiring of an interim high

school principal and displaced defendant Avella from her position. *Id.* at ¶ 40-41;

34.     On December 5, 2008, plaintiff DC privately showed two friends a document containing
        song lyrics which he and a friend "JR," who is a dark skinned Hispanic, wrote at home.
        DC then placed the paper face down on a table so that he could participate in class.
        Defendant Wimmer then picked up the paper, reviewed its content, then handed it to
        defendant Bouldin.  When confronted, DC stated they were song lyrics  (¶¶ 77-78);

35.     According to the Discipline Referral dated December 5, 2008 written by defendant
        Bouldin, the document contained several "racial statements"  (¶ 78);

36.     Furthermore, defendant Avella stated in a letter to Plaintiff DC's parents, TC and KC,
        that DC was "exhibiting disruptive behavior" when he was "observed during first period
        class, showing students a document that he wrote containing racial slurs, epithets, and
        inflammatory remarks", in violation of the Valley Central School District Code of
        Conduct and the High School Discipline Code contained within the Student Handbook
        (¶79);

37.     Student life at VCHS is governed, in part, by the Student Handbook and Code of
        Conduct, and by other Board of Education policies.   It does not define or make any
        reference to the context in which the prohibited operative terms such as "racial
        slurs/epithets" or "derogatory or inflammatory remarks" are proscribed therein.
        Furthermore, the movie "Ruby Bridges" is shown to 6th and 7th graders in the district.
        This movie is replete with racially charged language, even mentioning the "n" word and
        "jigaboo", yet it continues to be shown to the children;

38.     As a result of the Discipline Referral dated December 5, 2008, defendant Avella

immediately suspended DC for five days, according to the official notice, from December 8, 2008 through December 12, 2008.  However, DC's suspension actually began around 8:00AM on December 5, 2008, before plaintiffs TC and KC received written notice (¶ 80-85);

39.   Plaintiff DC was diagnosed at age 5 with severe ADHD, and has been on a 504 Plan since 7th grade.  His grades and behavior are indicative of a student having difficulties due to his disability (¶¶ 90-92) See **Exhibit "B",** Plaintiff DC's 504 Plan;

40.   As of the December 5, 2008 incident, at which time DC was in the 12th Grade, his 504 Plan had not been reviewed or updated since 7th grade despite receiving numerous "F's" and many discipline referrals for disability related behavior over the years (¶93);

41.   Prior to December 5, 2008, the administration never suggested adding a behavior modification plan to DC's 504 Plan, nor did they suggest any meetings with the school psychologist or conduct educational evaluations (¶94);

42.   Instead, defendant District continually used punishment as the sole means of handling plaintiff DC's behavior, with various teachers even going so far as to tell him that there is no such thing as ADHD or that he does not have ADHD (¶95);

43.   On December 11, 2008, the matter was referred to the 504 Committee for a Manifestation Determination to review whether DC's behavior on December 5, 2008 was a result of his disability.  This referral was made after the school's presentation of their case against DC in the defendant Hooley's Hearing, but before the Superintendent notified Plaintiffs of his finding of "Guilt", and only after KC remarked, after the hearing, that DC suffered from ADHD.  To that, the defendant Hooley responded "You think he has ADHD" (¶96).

44.  Plaintiffs received no prior written notice of the 10:00 AM Manifestation Determination meeting to be held on December 12, 2008, but instead were notified by phone the previous afternoon, leaving them no time to prepare (¶97);

45.  The December 12, 2008 Manifestation Determination meeting was a sham, based on an inadequate and outdated evaluation of Plaintiff DC done before he entered the Valley Central School District, more than eight years prior to the meeting (¶98);

46.  Plaintiffs were not provided with a notice of their 504 Due Process and Procedural Rights, nor were they given an opportunity to review Plaintiff DC's records, contrary to law.  The only person in attendance at the Manifestation Determination meeting, who might have had some understanding of the effects of ADHD on DC, aside from his parents, was the school psychologist, who admitted that she had never met DC (¶¶99-100);

47.  To Plaintiffs' knowledge, no formal re-evaluation was ever conducted in connection with the Manifestation Determination meeting by the 504 Committee.  Plaintiff DC's 504 Plan had not been reviewed or updated since before DC entered high school more than four years before (¶¶101-102);

48.  Plaintiff TC notified by defendant Hooley via telephone at 12:30 PM on December 12, 2008 that the Committee had found no nexus between plaintiff DC's disability and the December 5, 2008 incident.  Plaintiffs were informed, on that call, that DC was suspended for the remainder of the school year (¶103);

49.  The "no nexus" decision was made despite the fact that the 504 Committee had  just met prior to the Manifestation Determination meeting and determined that a Behavior

Modification Plan should be added to Plaintiff DC's 504 Plan. The school never followed through on that due to DC's suspension (¶¶104-105);

50. Plaintiffs were never informed as to how the "no nexus" decision was reached and were, in fact, lied to by VCSD, its employees and agents regarding Plaintiffs rights to a due process hearing under Section 504 of the Rehabilitation Act which they immediately requested (¶¶106-107);

51. Furthermore, plaintiffs found numerous inaccuracies in the written report they received, dated December 15, 2008, which 504 Chairperson, defendant DiMaio refused to correct (¶108);

52. In his letter dated December 22, 2008, which plaintiffs did not receive until December 29, 2008, defendant Hooley made it clear that his decision to suspend plaintiff DC for the remainder of the school year was based on all the incidents listed in the anecdotal record, even though most of those incidents were clearly related to plaintiff DC's ADHD and should not have been considered at all, as a "nexus" determination had not been made for any of them (¶¶87, 110-116);

53. Once suspended, plaintiff DC was denied eligibility for tutoring. Plaintiff TC made numerous contacts with the school, requesting a tutor for DC as he was failing math. TC was informed that DC could either drop math or TC could pay for the tutor himself (¶¶117, 122);

54. Upon his suspension, Plaintiff DC was not permitted to attend graduation, the prom, the senior trip or the Valley Central Summer School Program. DC was also prevented from continued participation in JROTC and thereby lost an opportunity to pursue a

commissioned military career (¶117);

55.   As a result of the Manifestation Determination Meeting, plaintiff DC was initially
      suspended for five days, but on December 22, 2008 defendant Hooley suspended Plaintiff
      DC for the remainder of the school year;

56.   Plaintiffs TC and KC hired an attorney to assist with their appeal to the Board of
      Education. (¶118)  This attorney turned out to be the personal attorney for the Board of
      Education president.  He never informed TC nor KC of his conflict of interest before or
      during the appeal process.  He was also ignorant of 504 law, requiring TC and KC to
      provide all 504 information to him.  They did not learn of his conflict until after the
      Board of Education appeal;

57.   In a letter dated January 13, 2009, the Board of Education denied Plaintiff DC's parents,
      TC and KC, request for appeal and upheld the Superintendent's decision without
      providing an explanation for their decision (¶119);

58.   In their search for a knowledgeable civil rights and Special Education attorney, plaintiffs
      were advised that the process would take a long time and DC was to graduate in June,
      2009.  Thus, no timely relief could be afforded as a result of the administrative process to
      remedy the defendant district's wrongs once DC had graduated.

59.   Plaintiffs retained the Law Office of Peter D. Hoffman, P.C. on May 12, 2009.  By then,
      the time to appeal the Board of Education Decision had expired  (¶¶ 167-168);

60.   Had plaintiffs filed an impartial hearing demand in May, 2009,  it would have been likely
      that DC would have graduated before a final resolution of our their would be rendered.
      Contrary to statute, which requires a resolution of impartial hearings within 45 days, it is

common practice for impartial hearings to be dragged on for many months before the hearing can be completed, and only then can an impartial hearing officer render its decision (¶¶ 169-170);

61.     Furthermore, if an appeal to the Office of State Review was initiated by either party, that appeal would also take months, and DC would have been graduated long before a final decision would be rendered (¶291);

62.     Following plaintiff DC's suspension from school, plaintiffs had DC examined, and the rap song in question reviewed, by expert psychiatrist, Milton C. Hollar, MD, who is of the opinion that DC is not and was not a racist or white supremacist, and that the song was not intended to be a racial slur/epithet nor in any manner derogatory or inflammatory aimed at any individual or ethnic group;

63.     Dr. Milton C. Hollar is also an expert in race relations;

64.     In February, 2009, a death threat was written on one of the bathroom walls in the school stating "DC" will die 2/12/09. Defendant district never advised plaintiffs of the death threat; although Sgt. Wimmer discovered it and reported it, and a photograph was taken of the threat on February 10, 2009. The threat was removed the same day; however, it was not reported to TC, KC or DC at the time of the event (¶¶123-125) See **Exhibit "C"** photographs of February 12, 2009 death theat.;

65.     On April 27, 2009, plaintiff TC learned of a second identical threat from a Valley Central High School student, not from anyone in the district administration. TC reported the matter the next day to defendant Taylor, Guidance Counselor, and Town of Montgomery Police Officer Kenneth Byrnes (¶¶126-128);

66.   At some point after the second death threat, there was a write up by Mr. Jurgens indicating that plaintiff DC's name was brought up in his class during a discussion of racism;

67.   In early May, after the second death threat, defendant Hooley contacted plaintiffs, approving a tutor for DC, to work with him six hours a week (¶131);

68.   After much insistence by plaintiffs TC and KC, a formal police report was finally filed on May 21, 2009, but they are unaware of any official police investigation ever taking place (¶¶129-130);

69.   At a meeting on May 22, 2009 with defendant Lynker and counsel for both plaintiffs and defendant District, plaintiffs TC and KC learned of the February death threat (¶133);

70.   On June 11, 2009, defendant Lynker advised plaintiffs that writing samples were taken of students in the JROTC and "other students of interest", but there were no conclusive matches. The letter further stated that the school would "continue to monitor the area and check for any new graffiti." (¶¶135-136);

71.   There is an apparent bias and appearance of impropriety on the part of the Office of State Review, more particularly with regard to Paul Kelly, who for some time has been the sole State Review Officer deciding appeals, and who has been under investigation. (¶¶292);

72.   Grounded in facts and hard data, the allegations against State Review Officer Kelly (hereinafter "SRO") are discussed in a 2007 article appearing on the front page of the Wall Street Journal[9], evidencing that SRO Kelly shows blatant partiality towards school

---

[9]Daniel Golden, *Staying The Course: Schools Beat Back Demands For Special Ed Services - Parents Face Long Odds Amid Cost Concerns*, The Wall ST. J., July 24, 2007, at 1A.

districts, frequently overruling former agency staff members when they found in parents'
favor, (¶293) (See **Exhibit "D"**);

73. These serious allegations erode public confidence in the integrity of the system.
Historically, SRO decisions were generated from a number of individuals.  Now,
however, all such SRO power is concentrated in the hands of a single individual, Paul F.
Kelly, an individual who has been charged with bias against parents. (¶¶294-295);

74. On September 25, 2009, local counsel, Mayorson & Associates, sent a request to the New
York State Legislature proposing an amendment to Section 4404 of the NY Education
Law to establish a panel of State Review Officers. In the request, Mr. Mayorson attaches
a spreadsheet, prepared by his firm, analyzing 187 recent decisions of Mr. Kelly from the
beginning of 2008 through June 29, 2009, showing further evidence of bias. (See **Exhibit
"E"**);

75. The pursuit of administrative remedies would have been feckless and futile because SRO
Kelly clearly exhibited blatant bias in favor of the school districts, in violation of the law
and his duty of impartiality.  Accordingly, any pursuit of out administrative remedies in
the context of an impartial hearing and appeal to the Office of State Review would have
been feckless and futile, exceeding all hope of due process.  It would not and could not
have provided the plaintiffs with an adequate remedy.

Dated: June 11 , 2010
     Katonah, NY

Law Office of Peter D. Hoffman, PC


By: _Jamie Mattice_

Jamie Mattice, Esq., (JM-0307)
Law Office of Peter D. Hoffman, P.C.
Attorney for Plaintiff
200 Katonah Avenue
Katonah, NY 10536
(914) 232-2242     phone
(914) 232-2245     facsimile
jkm@pdhoffmanlaw.com     e-mail

Peter D. Hoffman, Esq. (PH-8306)
Attorney for Plaintiff
200 Katonah Avenue
Katonah, NY 10536
(914) 232-2242     phone
(914) 232-2245     facsimile
pdh2@pdhoffmanlaw.com e-mail

Giulia Frasca, Esq., (GF-2545)
Law Office of Peter D. Hoffman, P.C.
Attorney for Plaintiff
200 Katonah Avenue
Katonah, NY 10536
(914) 232-2242     phone
(914) 232-2245     facsimile
GF@pdhoffmanlaw.com     e-mail